FRANK C. SPARKS COMPANY, Plaintiff, v. HUBER BAKING COM-
PANY, a Delaware corporation, Defendant and Counter-
Claimant, v. FRANK C. SPARKS COMPANY, *et al.*, Third Party
Defendants.

HUBER BAKING COMPANY, a Delaware corporation, Plaintiff, v.
FRANK C. SPARKS COMPANY, *et al.*, Defendants.

(*February* 16, 1955.)

LAYTON, J., sitting.

*Stewart Lynch* for Frank C. Sparks Company.

*William Prickett* for Huber Baking Company.

Superior Court for New Castle County, Nos. 345 and 346, Civil Action, 1950.

LAYTON, J.:

On April 29, 1949, while Sparks was laying a concrete floor on the second story of the Huber Bakery, there was a collapse, a beam fell and part of the concrete floor fell. Several workmen were injured. Thereafter, Sparks laid a new concrete floor which, according to Huber, was unsatisfactory. A number of suits were filed, some for injuries to the workmen and these because of the alleged negligent manner in which the floor was laid.

The concrete with which the floor in dispute was laid was furnished by the Warner Co. This corporation tests and records the results thereof of all concrete which it sells. For the purpose of making such tests it has, for many years, retained the services of Delaware Testing Laboratories operated by one Frank Pritchett. Pritchett apparently keeps at least one full-time employee at the Warner plant whose duty it is to test and check all materials, mixtures, etc., going into the concrete mix and to record the results. Upon complaint as to faulty concrete, Pritchett customarily makes tests and certifies his conclusions both to Warner and to the customer. It is admitted that Warner uses Pritchett's services among other things to further its customer relations.

After Sparks had laid the floor in question, Huber complained that it was wearing badly. Sparks notified Warner which caused Pritchett to investigate, test and report on the floor. In so doing, Pritchett visited Huber on several occasions and also conferred with representatives of Sparks. He filed a detailed report of his investigation both with Warner and Sparks.

Thereafter, the prosecution of these suits apparently gave way to preparation for the trial of the personal injury actions which involved a great deal more money. These latter actions having been settled last year, preparation for the trial of these suits commenced. In November or December, 1954, there was a conference between Sparks, Warner and Pritchett, looking to the preparation for trial of these suits where it was discovered for the first time that Pritchett had been specially retained by

Huber as an expert to aid in the preparation of its defense and had, in fact, made further tests upon the concrete floor and sub-mitted a written report to Huber's attorney.

Sparks has moved for an inspection of this report and Huber resists upon the grounds that (1) the report in question is within the privilege defined in *Hickman v. Taylor*, 329 *U. S.* 495, 67 *S. Ct.* 385, 91 *L. Ed.* 451, as being a part of the work product of an expert aiding an attorney in the preparation of his case, (2) there is an attorney-client privilege between Huber's attorney and Pritchett which cannot be invaded.

In *Scourtes v. Fred W. Albrecht Grocery Co., D. C.,* 15 *F. R. D.* 55, 58, the Court defines the "work product" of an attorney as follows:

"The 'work product' of an attorney consists only of impressions, observations and opinions which he has recorded and transferred to his file. *Hickman v. Taylor, supra.* It is the product of his investigation of a case in preparation for trial, in his capacity as attorney representing a client. It make no difference whether he functions autonomously or in the employ of a corporation in its legal department, so long as he is actually engaged in trial preparation. Likewise, the impressions, observations and opinions of a person hired by him and acting under his supervision and direction in the investigation of a case and its preparation for trial are part of his 'work product'. * * * The same is true of knowledge gained by an attorney through the efforts of an engineer or other expert whom he has employed to investigate matters of a technical or scientific nature."

Except on rare occasions, an attorney's work product is exempt from discovery, not because it falls within the so-called attorney-client privilege, but upon the theory that the private files and records of an attorney should be preserved from invasion by opposing counsel. In the rare case where it can be demonstrated that great hardship would otherwise result, a Court will go so

far as to compel production of an attorney's files.[1] We are here concerned with a report of an expert made at the request of an attorney in order to aid him in the preparation of this litigation. The theory of exemption here has been variously stated as being within the so-called "work product" rule or because it would be inequitable to allow an opponent to "pick the brains" of an expert hired at someone else's expense where other experts are readily available. *Lewis v. United Air Lines Transport Corp., D. C.,* 32 *F. Supp.* 21, 23.

It would be very simple to grant the request for discovery here upon the theory of the obvious hardship which would result because, with the floor now covered with wood, Sparks has no other way of obtaining this information.[2] But I prefer to confine my reasons to the peculiar relationship existing between the expert witness and the other parties interested in this litigation for the reason that this situation is common to both of the grounds upon which Huber resists this application for discovery.

It is my feeling that the rule which precludes discovery of a report of an expert made at the request of an attorney must be interpreted in the light of the facts of each case. Here, if Pritchett had been completely independent and in no

---

[1]For instance, see *Lewis v. United Air Lines Transport Corp., D. C.,* 32 *F. Supp.* 21, at page 23, where the Court said:

"If it should appear, however, that Mehl made changes in the cylinder, he should tell what those changes were; he should describe the appearance of the cylinder prior thereto and after the changes were made; furthermore, if he made any tests of the cylinder which cannot be repeated now with the same results because of the changes he has made, he should describe such tests and the results thereof."

[2]Huber's only defense to the almost certain hardship which would result to Sparks is that Sparks already has had many opportunities to inspect the floor and failed to avail itself of the privilege. This is true to some extent, but it must be remembered that the efforts of all attorneys up until comparatively recently was devoted to preparation for trial of the personal injury cases. Moreover, while as Huber asserts, Sparks did obtain an order for inspection of the Huber premises, yet a mere glance at the order shows that it was for the purpose of inspection for preparation of the personal injury cases, not the defective floor case. For these reasons, I regard this argument of Huber as without merit.

way connected with the parties to this litigation, then the request for discovery would have run afoul of the rule. But Pritchett was independent in name rather than in fact. Literally for years, though an independent contractor, he had been closely associated with Warner which supplied the concrete comprising the very floor in dispute. As such, he had an obligation not only to Warner but, since he was admittedly retained among other reasons to further customer relations, some obligation to Sparks. He had already tested the floor once and, in so doing, had conferences with both Huber and Sparks. He had already submitted one detailed report on the subject and given a copy to Sparks. It was at yet another conference bearing on this trial that it was discovered, for the first time, that he had been retained specially by Huber. There was an air of secretiveness about this which evidently took even Warner, his employer, by surprise. Theoretically, as Huber argues, no harm can result. Technically, Pritchett is independent. Sparks has the earlier report and now Pritchett's obligation is at an end because he has been employed specially by Huber. But the answer is not so easy.

The dangerous thing about the situation is the possibility that Huber, in retaining Pritchett, may indirectly "insulate" him from being of any service to Sparks. Up to the point of his being retained specially by Huber, Pritchett's services were open to all. He had written a detailed report for Warner and given copies to Huber and Sparks. He may or may not have said things in the original report or orally at some of the conferences which Sparks regarded as valuable to its side of the case. But the moment Pritchett becomes Huber's "man", so to speak, subject to close association with Huber and with the prospect of a fee looming in his mind, the possibility arises that his former attitude of complete impartiality may give way to that of partisanship with the result that Sparks' interests may suffer.

[3] I use the word "may" advisedly. I have no reason to believe such a result will come about in this very case. But the possibility of its happening at some other time as the result of a similar procedure warrants the discouraging of that practice at

its inception upon the ground of policy. Accordingly, I refuse to accept Huber's first defense against the motion for production.

Yet another serious question remains to be considered. Huber argues that the report in question is also exempt because within the attorney-client privilege. It cites *Wise v. Western Union Telegraph Co.*, 6 *W. W. Harr.* 456, 178 *A.* 640, 644, as authority for this proposition. In that case, well before the advent of the Federal Rules of Civil Procedure, 28 *U. S. C. A.*, the plaintiff, who ran some form of horse racing service for clients, sued the defendant because of an alleged forged or otherwise erroneous telegram originating over his name from Pottstown, Pa., which, he claimed, brought him into disrepute with some or all of the recipients of his service. Wise complained about this telegram to the Wilmington office which wired Boyer, manager of the Pottstown office, for an explanation. Boyer wired and also wrote to the effect that the telegram in question was the result of a bad error in his office and requesting Wilmington not to reveal the facts to the home office. Suit was ultimately brought and Wise demanded production of the telegram and letter. Judge Rodney denied production[3] but did use this very broad language relating to the attorney-client privilege:

" 'Documents prepared in relation to an intended action, whether at the request of a solicitor or not, and whether ultimately laid before the solicitor or not, are privileged if prepared with a bona fide intention of being laid before him for the purpose of taking his advice; and an inspection of such documents cannot be enforced.' "

This rule has long since been supplanted in the Federal Courts by *Hickman v. Taylor* and other cases hereinbefore disclosed. However, in *Reeves v. Pennsylvania R. Co., D. C.*, 8 *F. R. D.* 616, Judge Rodney, who had since become a Federal

---

[3]Because at the time the documents were written, it was not for the bona fide purpose of laying them before counsel in and about preparation for trial of a case.

Judge, adopted the rule as the law of Delaware. Perhaps he would not have felt the need of so doing but for the fact that the case was transferred from the State to the Federal Court because of diversity of citizenship. Thereafter, Judge Pearson in *Winter v. Pennsylvania R. Co.*, 6 *Terry* 108, 68 *A.* 2d 513, adopted the reasoning of the *Wise* case and recently, Judge Terry in *Empire Box Corp. of Stroudsburg v. Illinois Cereal Mills*, 8 *Terry* 283, 90 *A.* 2d 672, felt bound to follow it. The language of the *Wise* case, here under consideration, unfortunately contains no exception, as does the Federal Rule, in cases of hardship.[4]

Be that as it may, and for the same reasons which compelled me to deny Huber's argument that the work product rule was a valid defense, I also conclude that even under the rule of the *Wise* case, there can be no privilege under the facts here. Motion to produce and inspect the report from Pritchett to Huber granted.

[4]While the *Wise* case states the law as it then existed, correctly, it seems undesirable to have two rules, one the Delaware rule and that of the Federal Courts existing side by side, particularly when the rule of *Hickman v. Taylor* is capable of dealing with all such situations equitably.

While the so-called Delaware rule seems to be grounded on the attorney-client privilege and that of *Hickman v. Taylor* upon the theory of preserving an attorney's personal trial files from invasion by his opponent, yet, they are in essence the same but for the hardship provision existing in the Federal rule. I suggest, although I do not so decide, the possibility of reading the hardship provision of the Federal rule into the Delaware rule. Nothing in the language of the *Wise* case indicates that in a case of extreme hardship to one party, inspection of a report might not be granted. If the Delaware rule were so interpreted, it would not conflict with the Federal rule.