188 A.2d 125 (1963)
John P. GRAHAM and Yvonne M. Graham, on behalf of themselves and the other shareholders of Allis-Chalmers Manufacturing Company who may be entitled to intervene herein, Plaintiffs Below, Appellants,
v.
ALLIS-CHALMERS MANUFACTURING COMPANY et al., Defendants Below, Appellees.
Supreme Court of Delaware.
January 24, 1963.
H. James Conaway, Jr., of Morford, Young & Conaway, Wilmington, and Marvin Katz and Harry Norman Ball, Philadelphia, Penn., for appellants.
George Tyler Coulson, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Charles S. Quarles, of Quarles, Herriott & Clemons, Milwaukee, Wis., for individual defendants.
Richard F. Corroon, of Berl, Potter & Anderson, Wilmington, for Allis-Chalmers Manufacturing Co.
SOUTHERLAND, C. J., and WOLCOTT and TERRY, JJ., sitting.
*127 WOLCOTT, Justice.
This is a derivative action on behalf of Allis-Chalmers against its directors and four of its non-director employees. The complaint is based upon indictments of Allis-Chalmers and the four non-director employees named as defendants herein who, with the corporation, entered pleas of guilty to the indictments. The indictments, eight in number, charged violations of the Federal anti-trust laws. The suit seeks to recover damages which Allis-Chalmers is claimed to have suffered by reason of these violations.
The directors of Allis-Chalmers appeared in the cause voluntarily. The non-director defendants have neither appeared in the cause nor been served with process. Three of the non-director defendants are still employed by Allis-Chalmers. The fourth is under contract with it as a consultant.
The complaint alleges actual knowledge on the part of the director defendants of the anti-trust conduct upon which the indictments were based or, in the alternative, knowledge of facts which should have put them on notice of such conduct.
However, the hearing and depositions produced no evidence that any director had any actual knowledge of the anti-trust activity, or had actual knowledge of any facts which should have put them on notice that anti-trust activity was being carried on by some of their company's employees. The plaintiffs, appellants here, thereupon shifted the theory of the case to the proposition that the directors are liable as a matter of law by reason of their failure to take action designed to learn of and prevent anti-trust activity on the part of any employees of Allis-Chalmers.
By this appeal the plaintiffs seek to have us reverse the Vice Chancellor's ruling of non-liability of the defendant directors upon this theory, and also seek reversal of certain interlocutory rulings of the Vice Chancellor refusing to compel pre-trial production *128 of documents, and refusing to compel the four non-director defendants to testify on oral depositions. We will in this opinion pass upon all the questions raised, but, as a preliminary, a summarized statement of the facts of the cause is required in order to fully understand the issues.
Allis-Chalmers is a manufacturer of a variety of electrical equipment. It employs in excess of 31,000 people, has a total of 24 plants, 145 sales offices, 5000 dealers and distributors, and its sales volume is in excess of $500,000,000 annually. The operations of the company are conducted by two groups, each of which is under the direction of a senior vice president. One of these groups is the Industries Group under the direction of Singleton, director defendant. This group is divided into five divisions. One of these, the Power Equipment Division, produced the products, the sale of which involved the anti-trust activities referred to in the indictments. The Power Equipment Division, presided over by McMullen, non-director defendant, contains ten departments, each of which is presided over by a manager or general manager.
The operating policy of Allis-Chalmers is to decentralize by the delegation of authority to the lowest possible management level capable of fulfilling the delegated responsibility. Thus, prices of products are ordinarily set by the particular department manager, except that if the product being priced is large and special, the department manager might confer with the general manager of the division. Products of a standard character involving repetitive manufacturing processes are sold out of a price list which is established by a price leader for the electrical equipment industry as a whole.
Annually, the Board of Directors reviews group and departmental profit goal budgets. On occasion, the Board considers general questions concerning price levels, but because of the complexity of the company's operations the Board does not participate in decisions fixing the prices of specific products.
The Board of Directors of fourteen members, four of whom are officers, meets once a month, October excepted, and considers a previously prepared agenda for the meeting. Supplied to the Directors at the meetings are financial and operating data relating to all phases of the company's activities. The Board meetings are customarily of several hours duration in which all the Directors participate actively. Apparently, the Board considers and decides matters concerning the general business policy of the company. By reason of the extent and complexity of the company's operations, it is not practicable for the Board to consider in detail specific problems of the various divisions.
The indictments to which Allis-Chalmers and the four non-director defendants pled guilty charge that the company and individual non-director defendants, commencing in 1956, conspired with other manufacturers and their employees to fix prices and to rig bids to private electric utilities and governmental agencies in violation of the anti-trust laws of the United States. None of the director defendants in this cause were named as defendants in the indictments. Indeed, the Federal Government acknowledged that it had uncovered no probative evidence which could lead to the conviction of the defendant directors.
The first actual knowledge the directors had of anti-trust violations by some of the company's employees was in the summer of 1959 from newspaper stories that TVA proposed an investigation of identical bids. Singleton, in charge of the Industries Group of the company, investigated but unearthed nothing. Thereafter, in November of 1959, some of the company's employees were subpoenaed before the Grand Jury. Further investigation by the company's Legal Division gave reason to suspect the illegal activity and all of the subpoenaed employees were instructed to tell the whole truth.
*129 Thereafter, on February 8, 1960, at the direction of the Board, a policy statement relating to anti-trust problems was issued, and the Legal Division commenced a series of meetings with all employees of the company in possible areas of anti-trust activity. The purpose and effect of these steps was to eliminate any possibility of further and future violations of the antitrust laws.
As we have pointed out, there is no evidence in the record that the defendant directors had actual knowledge of the illegal anti-trust actions of the company's employees. Plaintiffs, however, point to two FTC decrees of 1937 as warning to the directors that anti-trust activity by the company's employees had taken place in the past. It is argued that they were thus put on notice of their duty to ferret out such activity and to take active steps to insure that it would not be repeated.
The decrees in question were consent decrees entered in 1937 against Allis-Chalmers and nine others enjoining agreements to fix uniform prices on condensors and turbine generators. The decrees recited that they were consented to for the sole purpose of avoiding the trouble and expense of the proceeding.
None of the director defendants were directors or officers of Allis-Chalmers in 1937. The director defendants and now officers of the company either were employed in very subordinate capacities or had no connection with the company in 1937. At the time, copies of the decrees were circulated to the heads of concerned departments and were explained to the Managers Committee.
In 1943, Singleton, officer and director defendant, first learned of the decrees upon becoming Assistant Manager of the Steam Turbine Department, and consulted the company's General Counsel as to them. He investigated his department and learned the decrees were being complied with and, in any event, he concluded that the company had not in the first place been guilty of the practice enjoined.
Stevenson, officer and director defendant, first learned of the decrees in 1951 in a conversation with Singleton about their respective areas of the company's operations. He satisfied himself that the company was not then and in fact had not been guilty of quoting uniform prices and had consented to the decrees in order to avoid the expense and vexation of the proceeding.
Scholl, officer and director defendant, learned of the decrees in 1956 in a discussion with Singleton on matters affecting the Industries Group. He was informed that no similar problem was then in existence in the company.
Plaintiffs argue that because of the 1937 consent decrees, the directors were put on notice that they should take steps to ensure that no employee of Allis-Chalmers would violate the anti-trust laws. The difficulty the argument has is that only three of the present directors knew of the decrees, and all three of them satisfied themselves that Allis-Chalmers had not engaged in the practice enjoined and had consented to the decrees merely to avoid expense and the necessity of defending the company's position. Under the circumstances, we think knowledge by three of the directors that in 1937 the company had consented to the entry of decrees enjoining it from doing something they had satisfied themselves it had never done, did not put the Board on notice of the possibility of future illegal price fixing.
Plaintiffs have wholly failed to establish either actual notice or imputed notice to the Board of Directors of facts which should have put them on guard, and have caused them to take steps to prevent the future possibility of illegal price fixing and bid rigging. Plaintiffs say that as a minimum in this respect the Board should have taken the steps it took in 1960 when knowledge of the facts first actually came to *130 their attention as a result of the Grand Jury investigation. Whatever duty, however, there was upon the Board to take such steps, the fact of the 1937 decrees has no bearing upon the question, for under the circumstances they were notice of nothing.
Plaintiffs are thus forced to rely solely upon the legal proposition advanced by them that directors of a corporation, as a matter of law, are liable for losses suffered by their corporations by reason of their gross inattention to the common law duty of actively supervising and managing the corporate affairs. Plaintiffs rely mainly upon Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662.
From the Briggs case and others cited by plaintiffs, e. g., Bowerman v. Hamner, 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed 1113; Gamble v. Brown, 4 Cir., 29 F.2d 366, and Atherton v. Anderson, 6 Cir., 99 F.2d 883, it appears that directors of a corporation in managing the corporate affairs are bound to use that amount of care which ordinarily careful and prudent men would use in similar circumstances. Their duties are those of control, and whether or not by neglect they have made themselves liable for failure to exercise proper control depends on the circumstances and facts of the particular case.
The precise charge made against these director defendants is that, even though they had no knowledge of any suspicion of wrongdoing on the part of the company's employees, they still should have put into effect a system of watchfulness which would have brought such misconduct to their attention in ample time to have brought it to an end. However, the Briggs case expressly rejects such an idea. On the contrary, it appears that directors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong. If such occurs and goes unheeded, then liability of the directors might well follow, but absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.
The duties of the Allis-Chalmers Directors were fixed by the nature of the enterprise which employed in excess of 30,000 persons, and extended over a large geographical area. By force of necessity, the company's Directors could not know personally all the company's employees. The very magnitude of the enterprise required them to confine their control to the broad policy decisions. That they did this is clear from the record. At the meetings of the Board in which all Directors participated, these questions were considered and decided on the basis of summaries, reports and corporate records. These they were entitled to rely on, not only, we think, under general principles of the common law, but by reason of 8 Del.C. § 141(f) as well, which in terms fully protects a director who relies on such in the performance of his duties.
In the last analysis, the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him. This is not the case at bar, however, for as soon as it became evident that there were grounds for suspicion, the Board acted promptly to end it and prevent its recurrence.
Plaintiffs say these steps should have been taken long before, even in the absence of suspicion, but we think not, for we know of no rule of law which requires a corporate director to assume, with no justification whatsoever, that all corporate employees are incipient law violators who, but *131 for a tight checkrein, will give free vent to their unlawful propensities.
We therefore affirm the Vice Chancellor's ruling that the individual director defendants are not liable as a matter of law merely because, unknown to them, some employees of Allis-Chalmers violated the anti-trust laws thus subjecting the corporation to loss.
Plaintiffs concede that they did not prove affirmatively that the Directors knew of the anti-trust violations of the company's employees, or that there were any facts brought to the Directors' knowledge which should have put them on guard against such activities. They argue, however, that they were prevented from doing so by unreasonable restrictions put upon their pre-trial discovery by the Vice Chancellor. They argue before us that this restriction was an abuse by the Vice Chancellor of judicial discretion and, hence, reversible error.
The argument made under this phase of the appeal breaks down into three categories, viz., first, the refusal to order the production of certain documents; second, the refusal to order the production of statements taken by the company's Legal Division in connection with its investigations of the anti-trust violations and in preparation for the company's defense to the indictments, and, third, the refusal to order the four non-appearing defendants whose depositions were being taken in Wisconsin to answer certain questions, or, in the alternative, to impose sanctions on the appearing defendants. We will take these subjects up in the order stated.
The documents which the Vice Chancellor refused to order production of are described in paragraphs 3 and 5(a) of the plaintiffs' motion to produce of January 23, 1961. Paragraph 3 of the motion asks production of all correspondence, notes, memoranda, etc., arising out of meetings, conferences and conversations in which company personnel participated dealing with the anti-trust activity, limited to the subject matter of the criminal indictments. Paragraph 5(a) of the motion asks the production of all such documents submitted to the Board of Directors.
With respect to the request contained in paragraph 5(a), it appears that earlier plaintiffs had sought and obtained such documents. We are concerned, therefore, solely with the denial of an order to produce those documents specified in paragraph 3.
The Vice Chancellor refused to order the production of the called-for documents on the grounds that the request was so broad as to open up a cumbersome and time-consuming examination of all aspects of the corporation's business within the field of inquiry, and would involve the disclosure, contrary to a long-established company policy, of precise sales information. He was of the opinion that the documents sought possibly would constitute evidence in a later accounting phase of the cause which, however, would be reached only if the liability of the Directors had been established. In his opinion, the sought-for documents would not support the theory of director liability and, consequently, at the then juncture of the cause were not the proper subject of discovery.
We must bear in mind that this motion was made under Chancery Rule 34, Del.C.Ann. which requires a showing of good cause before an order for production will be made. This means that the movant must demonstrate a need beyond the relevancy or materiality of the documents, and that no other avenue is open to him to obtain discovery. Empire Box Corporation of Stroudsburg v. Illinois Cereal Mills, 8 Terry 283, 90 A.2d 672. As we read this record, no other avenue to get the sought-for documents was explored by plaintiffs.
We note, furthermore, that the request of paragraph 3 was not limited or particularized. The request is for all correspondence, etc., arising out of or pertaining to meetings, conferences, telephone or other conversations in which the company's officers, *132 directors or employees participated "on any and all occasions from 1951 to the present," dealing with the subject matter of the indictments. The request sweeps within its embrace what could well be, in the language of the Vice Chancellor, "a vast assemblage of documents" and amounts in effect to a fishing expedition. Furthermore, we agree with the Vice Chancellor that the director defendants might well have no knowledge of these documents, and that they probably had no duty to have any knowledge of them.
The cause was tried below on the theory that preliminarily some showing of director liability must be made before Allis-Chalmers would be ordered to throw open its files to an untrammeled inspection by plaintiffs. They failed to make such a showing in fact as well as in law and, consequently, we think the Vice Chancellor committed no abuse of discretion in refusing to subject Allis-Chalmers to the harassment of unlimited and time-consuming inspection of records, which, except for broad generality of statement made by plaintiffs, bore no relation to the issue of director liability.
The order denying the motion to produce the documents described in paragraph 3 is affirmed.
The second subject urged as error is the refusal of the Vice Chancellor to order the production of statements taken from the non-director defendants in connection with its investigation of the antitrust violations and in preparation for the defense of the indictments. It appears that the statements in question were taken by Allis-Chalmers' attorneys as the result of interviews seeking to ascertain acts which, if imputed to Allis-Chalmers, might constitute anti-trust violations. The written memoranda made as the result of such interviews have remained in the exclusive possession of the company's attorneys.
Plaintiffs seek production of these memoranda upon the authority of Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451, which held that the attorney-client privilege does not apply to information and statements which a lawyer secures from a witness while acting for his client in preparation for litigation.
The rule of Hickman v. Taylor, however, has not been followed in this state. Prior to that decision, in Wise v. Western Union Telegraph Co., 6 W.W.Harr. 456, 178 A. 640, an accident report made by defendants' agents as a result of interviews with defendant's employees was held to be privileged if taken for the purpose of the guidance of an attorney in pending litigation. In so holding, the court adopted the so-called English Rule on the subject. Thereafter, Hickman v. Taylor was decided but in Reeves v. Pennsylvania R. R. Co., D.C., 8 F.R.D. 616, sitting in the Federal District Court for Delaware, the same judge who wrote the opinion in the Wise case held that the adoption of the 1948 Superior Court Rules, patterned on the Federal Rules of Civil Procedure, had not changed the rule of the Wise case. The same result was reached in Zenith Radio Corp. v. Radio Corp. of America, D.C., 121 F.Supp. 792, in which the Federal District Court for Delaware applied the Wise rule. Similarly, in Winter v. Pennsylvania R. R. Co., 6 Terry 108, 68 A.2d 513, and Empire Box Corp. of Stroudsburg v. Illinois Cereal Mills, supra, the Wise case was considered as controlling authority, and in Sparks Co. v. Huber Baking Co., 10 Terry 267, 114 A.2d 657, the continuing authority of the Wise case was recognized.
The statements sought by this motion fall within the rule of the Wise case as privileged documents obtained by reason of an attorney-client relationship. As such, an inspection of them may not be enforced.
Thirdly, the plaintiffs complain against the refusal of the Vice Chancellor to order the four non-appearing defendants to answer certain questions they had refused to answer during the taking of their depositions in Wisconsin, or, in the alternative, *133 to impose sanctions on the appearing defendants.
The refusal to answer took place during the taking in Wisconsin of the depositions of the four non-appearing defendants. These four men were represented during the depositions by their own separate counsel on whose advice they refused to answer on the ground of possible self-incrimination. They were at the time under indictment for violation of the anti-trust laws. At this time they had pleaded guilty to the indictments and were awaiting sentence. The refusal to answer was based upon possible self-incrimination under the Federal Anti-Trust Laws and under the Wisconsin Anti-Trust Laws.
The Vice Chancellor did not rule on the validity of the constitutional privilege claimed, but refused to order the witnesses to answer on the ground that he was without power to compel answers from individuals over whom no jurisdiction had been obtained.
Plaintiffs argue that answers could have been forced by the imposition of sanctions under Chancery Rule 37(b) which applies to parties or managing agents of parties. It is, of course, true that the four non-appearing defendants were managing agents of Allis-Chalmers, and that, strictly speaking, the rule would seem to authorize the imposition of sanctions against Allis-Chalmers. The question immediately presents itself, however, as to what form the sanctions would take since, while a nominal defendant, Allis-Chalmers is the party on whose behalf this action has been brought. It would seem to aid the plaintiffs very little to penalize the corporation which their action seeks to benefit.
There is, however, a complete answer to the argument. Plaintiffs had a remedy to obtain a ruling on the propriety of the refusal to answer, and, if that ruling was favorable, to force answers under the ruling of a court. Plaintiffs could have examined the four witnesses in Wisconsin under a Commission issued pursuant to 10 Del.C. § 368, and thus obtained the aid of a Wisconsin court in compelling answers. This, we think, is a complete answer to plaintiffs' argument and supports the ruling of the Vice Chancellor.
Finally, plaintiffs argue that error was committed by the failure of the Vice Chancellor to even consider whether or not an inference unfavorable to the Directors should be drawn from their failure to produce as witnesses at the trial the Allis-Chalmers employees named as defendants in the indictments. To be sure, no mention of the argument is made in the opinion below, but this does not necessarily mean that the argument was not considered. It may have been and discarded. In any event, we think, in the absence of any evidence telling against the Directors, any justifiable inference to be drawn from the failure to produce the witnesses could not rise to the height necessary to supply the plaintiffs' deficiency of proof.
The judgment of the court below is affirmed.