# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEBANON COUNTY EMPLOYEES' RETIREMENT FUND and TEAMSTERS LOCAL 443 HEALTH SERVICES & INSURANCE PLAN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-1118-JTL |
| STEVEN H. COLLIS, RICHARD W. GOCHNAUER, LON R. GREENBERG, JANE E. HENNEY, KATHLEEN W. HYLE, MICHAEL J. LONG, HENRY W. MCGEE, ORNELLA BARRA, D. MARK DURCAN, and CHRIS ZIMMERMAN, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| AMERISOURCEBERGEN CORPORATION, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 23, 2022
Date Decided: December 22, 2022

Samuel L. Closic, Eric J. Juray, Robert B. Lackey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Lee D. Rudy, Eric L. Zagar, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Jeroen van Kwawegen, Eric J. Riedel, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Frank R. Schirripa, Daniel B. Rehns, Kurt Hunciker, Hillary Nappi, HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York; Gregory Mark Nespole, Daniel

Tepper, LEVI & KORSINSKY, LLP, New York, New York; Brian J. Robbins, Craig W. Smith, ROBBINS LLP, San Diego, California; *Counsel for Plaintiffs*.

Stephen C. Norman, Jennifer C. Wasson, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael S. Doluisio, Carla Graff, DECHERT LLP, Philadelphia, Pennsylvania; Matthew L. Larrabee, Hayoung Park, DECHERT LLP, New York, New York; Michael D. Blanchard, Amelia Pennington, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Counsel for Defendants*.

**LASTER, V.C.**

Over the past two decades, an opioid epidemic has devastated America. Much of it has been driven by prescription opioids. As one of three major wholesale distributors of prescription opioids in the United States, nominal defendant AmerisourceBergen Corporation ("AmerisourceBergen" or the "Company") has faced a barrage of lawsuits over its alleged role as a contributor to the opioid epidemic. In 2021, AmerisourceBergen agreed to pay over $6 billion as part of a nationwide settlement to resolve multidistrict litigation brought against the Company and the other major opioid distributors (the "2021 Settlement"). AmerisourceBergen has paid hundreds of millions to settle other lawsuits and has incurred over $1 billion in defense costs. Those financial figures do not attempt to quantify the reputational harm that the Company has suffered, nor the damage from lost opportunities or management distraction. Those harms obviously pale in comparison to the human toll of the opioid epidemic.

The plaintiffs own stock in AmerisourceBergen. They seek to shift the responsibility for the harms that AmerisourceBergen has suffered to the individuals who they believe caused the Company to suffer harm. They contend that the Company's officers and directors breached their fiduciary duties to the Company and should be held personally liable for the consequences of their actions.

The plaintiffs advance two theories of breach. Their first theory relies on the settled principle that corporate fiduciaries cannot consciously ignore evidence indicating that the corporation is suffering or will suffer harm. Most plainly, corporate fiduciaries cannot knowingly ignore red flags evidencing legal non-compliance. This type of theory is sometimes called a prong-two *Caremark* claim. Taking a functional approach, Chancellor

McCormick has helpfully referred to this type of claim as a "Red-Flags Theory" or a "Red-Flags Claim." *City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at *17 (Del. Ch. June 30, 2022).

For their Red-Flags Theory, the plaintiffs start from the proposition that as a distributor of opioids, AmerisourceBergen was obligated to comply with extensive regulatory frameworks imposed by federal and state law. The federal regulatory frameworks require that a distributor report any suspicious orders to the federal Drug Enforcement Agency (the "DEA"). A distributor must either not fill a suspicious order or first conduct due diligence sufficient to ensure that the order will not be diverted into improper channels.

The plaintiffs contend that as the Company's legal troubles grew, its officers and directors were confronted with a steady stream of red flags indicating that the Company was not complying with its anti-diversion obligations. Those red flags took the form of congressional investigations, subpoenas from prosecutors, lawsuits by state attorneys general, and an eventual torrent of civil lawsuits. Meanwhile, as the opioid epidemic raged, the Company continued to report suspicious orders at incomprehensibly low rates. The plaintiffs contend that based on those red flags, the defendants knew that the Company was violating its opioid diversion obligations and needed to implement stronger systems of oversight. Yet the Company's officers and directors consciously ignored the red flags and did not take any meaningful action until the 2021 Settlement.

For their second theory, the plaintiffs invoke the admonition that "Delaware law does not charter law breakers." *In re Massey Energy Co.*, 2011 WL 2176479, *20 (Del.

2

Ch. May 31, 2011). "As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *Id.* Chancellor McCormick has helpfully described this type of theory as a "*Massey* Theory" or a "*Massey* Claim." *Hamrock*, 2022 WL 2387653, at *17.

For their *Massey* Claim, the plaintiffs seek an inference that the Company's officers and directors took a series of acts which, when viewed together, support a pleading-stage inference that they knowingly pursued a business plan that prioritized profits over compliance. The plaintiffs allege that between 2010 and 2015, the Company's officers and directors aggressively expanded the Company's distribution networks without devoting comparable resources to anti-diversion control. As the decisive evidence of this strategy, they point to the 2015 implementation of a revised order monitoring program (the "Revised OMP"), which management and the directors knew was designed to tank the rate of suspicious order reporting and evade the federal anti-diversion frameworks. The Company's officers and directors then maintained their illegal business strategy through the 2021 Settlement.

The defendants have moved to dismiss the plaintiffs' claims for failing to support an inference of demand futility. The plaintiffs argue that the demand is futile because their claims present facts supporting a reasonable inference that at least half of the directors in office when the lawsuit was filed face a substantial threat of liability.

Standing alone, the avalanche of investigations and lawsuits without any apparent response until the 2021 Settlement would support a well-pled Red-Flags Claim. Likewise, the series of decisions that culminated in the Revised OMP, along with the decision to keep

3

that framework in place until the 2021 Settlement, would support a well-pled *Massey* Claim.

The defendants maintain that the documents they produced after a hard-fought books-and-records action, and which the complaint incorporates by reference, reveal that the board adopted the Revised OMP on the advice of management. The documents also show that in 2017, the board received a presentation on the Company's anti-diversion controls. In 2018, the Audit Committee conducted its first-ever review of the Company's anti-diversion controls. And in 2019, the Audit Committee conducted a similar review. The defendants say those actions foreclose any reasonable inference of wrongdoing, whether framed as a Red-Flags Theory or a *Massey* Theory.

If that were the sum of the matter, then the pleading-stage record would support two competing inferences. The plaintiff-friendly inference is that the defendants knew that AmerisourceBergen was reporting astoundingly low levels of suspicious orders, understood that was the whole purpose of the Revised OMP, and went through the motions of providing oversight, while consciously deciding not to take any action until the 2021 Settlement so that they could use changes to the Revised OMP and their oversight policies as part of the settlement currently. The defendant-friendly inference is that the defendants were doing their jobs, believed that the Revised OMP complied with applicable law, and did not take any action because they did not believe they were doing anything wrong. At the pleading stage, the court must adopt the plaintiff-friendly inference, so the complaint would survive the motion to dismiss.

But there is a final factor that fatally undermines the complaint. In 2022, the United States District Court for the Southern District of West Virginia (the "West Virginia Court") issued a post-trial decision in which the City of Huntington and the Cabell County Commission asserted that AmerisourceBergen and the other major opioid distributors had failed to comply with their anti-diversion obligations, thereby fueling the opioid epidemic in those localities. After a two-month trial, during which seventy witnesses testified either live or by deposition, the court rejected the plaintiffs' theory and found that the defendants had not violated their anti-diversion obligations. The court expressly found that AmerisourceBergen had complied with its anti-diversion obligations.

Although the federal court's findings are not preclusive, they are persuasive. Both the Red-Flags Theory and the *Massey* Theory depend on an inference that the officers and directors knowingly failed to cause the Company to comply with its anti-diversion obligations, either because they consciously ignored red flags that put them on notice of violations or because they intentionally adopted a business plan that prioritized profits over compliance. In light of the West Virginia Court's thorough analysis, it is not possible to infer that the Company failed to comply with its anti-diversion obligations, nor is it possible to infer that a majority of the directors who were in office when the complaint was filed face a substantial likelihood of liability on the plaintiffs' claims. Demand is therefore not futile, and the plaintiffs lack standing to assert their claims on the Company's behalf.

## I.  FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents that the complaint incorporated by reference. Before filing this lawsuit, the plaintiffs spent two years litigating

5

a books-and-records action in which AmerisourceBergen raised a host of defenses, including arguments that sought to defend preemptively against the merits of an eventual derivative action. The plaintiffs prevailed at the trial level and on appeal. *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020). After that hard-fought and resource-intensive victory, the plaintiffs obtained books and records under the terms of a confidentiality order, which provided that if the plaintiffs relied on the documents in a future action, then all of the documents "will be deemed incorporated by reference in any complaint subject to the conditions set forth in *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752 (Del. Ch. 2016), subject to Delaware law." C.A. No. 2019-0527-JTL, Dkt. 64 ¶ 9 (Del. Ch. May 8, 2020).

Relying on the incorporation-by-reference condition, the defendants submitted sixty-one exhibits in support of their opening brief, plus another seven exhibits in support of their reply brief. The defendants ask the court to consider the sixty-eight exhibits when evaluating the allegations of the complaint.[1]

The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to

---

[1] Citations in the form "Ex. — at —" refer to exhibits that the defendants submitted. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number. Citations in the form "Compl. ¶ ___" refer to the paragraphs of the complaint.

have drawn is a reasonable one.[2] The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document. But the doctrine does not change the pleading standard that governs a motion to dismiss. If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff had made a well-pled factual allegation, then the court must credit the allegation. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The plaintiff also remains entitled to "all reasonable inferences." *Id.* at 897. Consequently, if a document supports more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference. *Id.*

At this stage of the proceeding, the well-pled allegations of the complaint are deemed to be true. The plaintiff is entitled to all reasonable inferences that the well-pled allegations support. To the extent that factual allegations or documents incorporated by reference support competing inferences, the plaintiffs are entitled at this stage to the inference that favors their claims.

The factual background for this decision emphasizes the facts pertinent to the demand futility analysis. The factual background therefore de-emphasizes or omits certain facts that figured into the court's analysis of the defendants' timeliness defense.

---

[2] *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 & n.17 (Del. Ch. Feb. 21, 2014).

**A.      AmerisourceBergen's Legal Obligations As An Opioid Distributor**

In the United States, AmerisourceBergen is one of the "Big Three" wholesale distributors of pharmaceutical products, along with Cardinal Health, Inc. and McKesson Corporation.[3] AmerisourceBergen and McKesson each control approximately one-third of the market, and Cardinal Health controls another fifth.

As an opioid distributor, AmerisourceBergen serves as a middleman between the companies who manufacture opioids and the pharmacies that fill prescriptions. When acting as a distributor, AmerisourceBergen must comply with the Comprehensive Drug Abuse Prevention and Control Act of 1970 and its implementing regulations (collectively, the "Controlled Substances Act"). To obtain and maintain a license to distribute opioids, a company must maintain "effective controls against diversion of [opioids] into other than legitimate medical, scientific, research, and industrial channels." 21 U.S.C. § 823(b)(1). A distributor must also "design and operate a system to disclose to the registrant suspicious orders of [opioids]." 21 C.F.R. § 1301.74(b). "Suspicious orders include orders of unusual

---

[3] The Company has conducted its pharmaceutical distribution business through two subsidiaries: AmerisourceBergen Drug Corporation (the "Drug Company") and AmerisourceBergen Specialty Group, LLC (the "Specialty Group"). The Drug Company distributed healthcare products and supplies, including opioids, and provided pharmacy management and other consulting services to institutional healthcare providers such as hospitals and retail pharmacies. The Specialty Group served the specialty pharmaceuticals market, focusing on products involving biotechnology, blood plasma, and oncology. The Specialty Group also provided pharmaceutical distribution and related services to physicians and institutional healthcare providers. While important for many reasons, the distinctions between AmerisourceBergen and its subsidiaries are not relevant to this decision, which refers only to AmerisourceBergen.

size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

A distributor must report suspicious orders to the DEA. Once a distributor has reported a suspicious order, it must either (i) decline to ship the order or (ii) ship the order only after conducting due diligence and determining that the order is not likely to be diverted into illegal channels. *See Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212–13 (D.C. Cir. 2017). The DEA can suspend or revoke the license of any distributor that fails to maintain controls or respond appropriately to suspicious orders. *See* 21 U.S.C. § 824.

The DEA may determine that substantial compliance with the order-diversion requirements is sufficient. 21 C.F.R. § 1301.71(b). "A registrant's regulatory obligations . . . do not require strict compliance. Only substantial compliance is required." *In re Nat'l Prescription Opiate Litig.*, 2021 WL 3917174, at *3 (N.D. Ohio Sept. 1, 2021).

## B.     The Ongoing Opioid Crisis

The United States remains mired in an opioid epidemic that has spanned more than two decades, killed hundreds of thousands of Americans, and affected the lives of millions more. In the late 1990s, the pharmaceutical industry made a massive push to increase the use of prescription opioids to treat pain management. Manufacturers made new formulations of extended-release opioids, which they marketed as non-addictive and superior to existing pain management options. Doctors responded by writing more prescriptions for opioids, often without appreciating or advising patients about the risk of addiction.

9

A vicious cycle developed in which increasing levels of opioid abuse generated greater demand for opioids. Between 1999 and 2014, the sale of prescription opioids in the United States nearly quadrupled. The medications proved far more addictive and dangerous than the pharmaceutical industry led the nation to believe, and the expanded use of the medications resulted in widespread misuse. As many as 29% of the patients who were prescribed opioids for chronic pain misused them, and as many as 12% developed an opioid-use disorder.

The increased abuse of opioids had tragic consequences. The Centers for Disease Control and Prevention reported that there had been nearly 218,000 overdose deaths related to prescription opioids between 1999 and 2017. Between 2000 and 2015, the rate of opioid overdose deaths in the United States more than tripled. The number of opioid-related deaths reached 69,710 in 2020, and opioid overdoses comprised the vast majority of drug overdoses in the country.

To help fight the epidemic, the DEA increased its scrutiny of distributors. AmerisourceBergen and its competitors supplied drugs to pharmacies using "just-in-time" delivery. That meant that most pharmacies received drug deliveries every day—sometimes multiple times a day. Because deliveries were so frequent, the distributors knew exactly how many opioid pills they were delivering to each pharmacy. The distributors thus were uniquely positioned to assess whether pharmacies were facilitating the diversion of prescription opioids.

## C.      The Independent Pharmacy Strategy

After some run-ins with the DEA over poor anti-diversion controls in 2007, AmerisourceBergen worked with the DEA to establish an industry-standard order monitoring program (the "2007 OMP"). As part of that process, AmerisourceBergen engaged Davis Polk & Wardwell LLP to assess the Company's compliance program. Ex. 45 at '664. In August 2010, the Audit Committee reviewed Davis Polk's report, which concluded that the Company's compliance program "was functioning effectively," although the firm "made [a] few process improvement suggestions that were implemented, including better tracking of compliance issues." *Id.*

The complaint depicts 2010 as the high-water mark for AmerisourceBergen's anti-diversion compliance. The plaintiffs allege that in early 2010, management received the go-ahead from the board to maximize the value that the Company could extract from the independent pharmacy market (the "Independent Pharmacy Strategy"). Independent pharmacies offered a significant source of profits because they had less market power than chain pharmacies and therefore could not bargain as effectively for lower prices. Their smaller size also meant that they had fewer resources to devote to monitoring suspicious orders and could more easily become pill mills.

During 2011, management continued to pursue the Independent Pharmacy Strategy. Management focused on improving the efficiency of the Company's sales force and expanding the number of independent pharmacies that the Company served. The strategy worked, with sales to independent pharmacies increasing year-over-year by 11.7%.

11

Management and the directors did not devote similar resources to improving the Company's anti-diversion efforts. Instead, management emphasized cost control, expense reductions, and efficiency gains.

At the time, Chris Zimmerman was in charge of diversion control. On April 22, 2011, he sent an email to the five senior members of the diversion control team that contained a set of lyrics for a song titled "Pillbillies," a parody of the theme song for *The Beverly Hillbillies*. The parody described opioid addicts visiting Florida pain clinics to buy "Hillbilly Heroin." Another email that circulated among the senior compliance staff included the lyrics for the song "OxyContinVille," a parody of Jimmy Buffet's "Margaritaville," which described addicts driving from Kentucky to Florida "Lookin' for pill mills." On May 6, 2011, Zimmerman emailed the diversion control leadership team about recently enacted Florida legislation that was designed to crack down on pill mills. He offered the following prediction: "Watch out Georgia and Alabama, there will be a mass exodus of Pillbillies heading north." Compl. ¶ 110.

In March 2012, Zimmerman was promoted to the positions of Chief Compliance Officer and Senior Vice President in charge of Corporate Securities and Regulatory Affairs ("Regulatory Affairs"), a position he held until October 2018. During that period, Zimmerman and his division were responsible for overseeing the Company's order monitoring program and anti-diversion efforts. Zimmerman personally was responsible for bringing issues to the attention of the Audit Committee.

Zimmerman's communications with his team support a pleading-stage inference that he was not a suitable individual to hold these critical positions. But the complaint does

12

not support an inference that the directors knew about Zimmerman's callous and inappropriate communications with his team.

In early 2012, management reported to the board that the DEA had suspended Cardinal Health's controlled substances license for a distribution facility in Lakeland, Florida based on its dealings with four independent pharmacies. In the face of the DEA's enforcement actions, management doubled down on the Independent Pharmacy Strategy and sought to further increase AmerisourceBergen's market share by offering "a 'light touch' franchise model" and "friendly landings" for pharmacies looking to transfer ownership. *Id.* ¶ 119. The model amounted to the easy onboarding for new independent pharmacies and minimal compliance-related diligence by AmerisourceBergen.

Two months after reporting on the DEA's enforcement action against Cardinal Health, management reported that the Company had received subpoenas from the DEA and the United States Attorney's Office for the District of New Jersey that sought documents concerning the Company's order monitoring program. In June 2012, the Attorney General of West Virginia named AmerisourceBergen as a defendant in a lawsuit that alleged violations of state law related to the distribution of opioids. By August 2012, the Company considered regulatory compliance to be the number two risk factor facing the drug distribution business for the 2013 fiscal year. Ex. 47 at '464.

In November 2012, the Audit Committee received a report on the Company's regulatory compliance efforts, including its anti-diversion controls. The report informed the committee members that AmerisourceBergen's levels of suspicious order reporting were extremely low:

13

| AmerisourceBergen Averaged 215,000,000 Line Orders from 2009-2012 | |
|---|---|
| | Suspicious Orders Reported |
| 2009 | 0.000864% [1,858] |
| 2010 | 0.001085% [2,322] |
| 2011 | 0.001870% [4,020] |
| 2012 | 0.002564% [5,512] |

The committee also learned that the Company was expending far fewer resources on compliance than peer companies. Its staff of fourteen internal audit personnel was less than one-third the average of forty-six internal audit staff at other Fortune 500 companies. AmerisourceBergen's internal audit expenditure of $1.85 million compared similarly to the $7.1 million average at other Fortune 500 companies.

**D. The Walgreens Alliance**

During 2013, management sought to increase the Company's sales further through an alliance with Walgreens. AmerisourceBergen estimated that the alliance would increase its orders for controlled substances by 213%. By increasing order flow, the alliance would increase the risk of order diversion. Not only that, but Walgreens was already having problems with the DEA. In June 2013, Walgreens agreed to pay an $80 million fine to the DEA for allowing opioids to be diverted for misuse.

Anticipating the significant expansion in its distribution business, management reported to the board that the diversion control group in Regulatory Affairs would increase from just five employees to seven, and the investigations group would increase from only four employees to six. Management thus planned to increase order-diversion resources at

14

a lower rate than sales and in the context of an alliance with a company that had recent problems with diversion control.

As 2013 wore on, it became clear that the regulatory and enforcement environment was intensifying. The DEA and the United States Attorney's Office for the District of New Jersey continued their investigations into the Company, and the United States Attorneys for the District of Kansas and the Northern District of Ohio served subpoenas of their own. During its meeting in October 2014, the Audit Committee learned that the United States Attorney's Office for the District of New Jersey had subpoenaed the Company's outside auditor as part of its grand jury investigation. Board minutes throughout 2014 contain references to reports on the Company's order monitoring program.

E.    **The Revised OMP**

In 2015, against a backdrop of increasing legal scrutiny and already low levels of suspicious order reporting, management and the board implemented the Revised OMP. The plaintiffs contend that the Revised OMP was plainly intended to reduce the number of suspicious orders that the Company would report to the DEA. The plaintiffs assert that, when viewed in conjunction with the Company's efforts to expand its opioid distribution business through measures like the Independent Pharmacy Strategy and the Walgreens alliance, and in the context of intensifying regulatory risk, the adoption of the Revised OMP evidences a knowing breach of fiduciary duty, in which the directors prioritized profits over compliance.

In March 2015, Zimmerman gave a presentation to the Audit Committee about the Revised OMP. He was assisted by David May, the Director of Diversion Control and

15

Federal Investigations. May had joined AmerisourceBergen in 2014 after working for the DEA for thirty years.

The Company was still using the 2007 OMP, which flagged orders using static thresholds. The Revised OMP added a second test that compared an individual order's size against "[d]ynamic thresholds refreshed annually based upon actual consumption data over the most recent 12-month period." Compl. ¶ 166. It thus added an additional trigger that would fail only if a current order was inconsistent with the customer's recent pattern of orders. Ultimately, both tests needed to fail for an order to be flagged for investigation.

As depicted in a Venn diagram presented to the Audit Committee, the double-trigger would inevitably result in only a small fraction of AmerisourceBergen's orders being flagged for investigation:



CONFIDENTIAL INSPECTION MATERIAL                                    LEBANON_010776

Ex. 39 at 9.

The Audit Committee reported on this presentation to the full board the next day. After the board meeting, the Revised OMP went into effect.

Between 2014 and 2015, the level of suspicious orders that AmerisourceBergen reported to the DEA declined by 86%, dropping from 14,003 to 1,892. Over the same period, AmerisourceBergen's total orders increased by 8.6%, from 20,777,594 to 22,560,562.

Between 2015 and 2016, the level of suspicious orders that AmerisourceBergen reported to the DEA declined by another 92%, dropping from 1,892 to 139. Over the same

period, AmerisourceBergen's total orders increased by 6.7%, from 22,560,562 to 24,067,791.

The following table shows the impact of the Revised OMP.

| Percentage of Orders Flagged and Reported to the DEA | | | | |
|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** |
| **Orders Placed** | 13,580,197 | 20,777,594 | 22,560,562 | 24,067,791 |
| **Orders of Interest** | 60,499 | 78,707 | 83,407 | 48,888 |
| **Orders Reported** | 24,103 | 14,003 | 1,892 | 139 |
| **Percent of All Orders Flagged (derived)** | 0.445% | 0.379% | 0.370% | 0.203% |
| **Percent of All Orders Reported (derived)** | 0.177% | 0.067% | 0.008% | 0.0006% |

The Revised OMP was not the only problem with the order monitoring system. In August 2015, AmerisourceBergen engaged FTI Consulting, Inc. to conduct a review of how AmerisourceBergen went about investigating orders of interest. FTI identified a series of deficiencies, including a lack of resources, a lack of formal training, inconsistent policies, and communication breakdowns. The report identified the Company's regulatory obligations related to diversion control as one of the "Gaps & Risks" that needed to be addressed.

## F.    2017: More Red Flags

In January 2017, the Audit Committee was informed that AmerisourceBergen had entered into a $16 million settlement with the State of West Virginia to resolve claims

regarding opioid distribution. The Audit Committee was advised that other West Virginia County Commissions and cities had filed similar complaints. In March 2017, the full board received an update on the lawsuits that various West Virginia cities and communities had filed against AmerisourceBergen.

In May 2017, the Audit Committee received a further report which listed Legal Contingencies as an "Area of Emphasis." *See* Ex. 5, at '510–14. During the meeting, the Audit Committee received a presentation from management on the Revised OMP. *See* Ex. 3 at '960; Ex. 4 at '023. Lead director Jane E. Henney asked management to provide "an in-depth review of the Company's compliance program" at the board's meeting in August. Compl. ¶ 197.

Also in May 2017, the Energy and Commerce Committee of the United States House of Representatives (the "House Committee") opened a bipartisan investigation into large opioid shipments to small-town pharmacies in West Virginia. Two months later, United States Senator Claire McCaskill of Missouri, then the Ranking Member of the Senate Committee on Homeland Security and Governmental Affairs, requested documents and information related to AmerisourceBergen's anti-diversion efforts.

During the board's meeting in August 2017, Zimmerman and May provided a presentation that the directors had asked for about the Company's anti-diversion efforts. The directors also received sixteen pages of written materials. The presentation described the Revised OMP and its "Data Driven Risk Adjusted Framework." *Id.* ¶ 213. Zimmerman and May explained that the program established "individual customer order and peer group parameters relying on widely accepted methodology for identifying statistical outliers." *Id.*

19

The presentation noted that orders exceeding the program parameters became "orders of interest" that were "reviewed and adjudicated by trained personnel," with the Company canceling and reporting any orders that were determined to be suspicious. *Id.* The presentation added that management was creating a new opioid task force that would focus on developing "proactive initiatives to address issues surrounding controlled substances." *Id.* ¶ 210.

The presentation identified a total of eighteen individuals assigned to diversion control, including a Senior Director of Diversion Control and Federal Investigations, a Director of Diversion Control, a DEA Consultant, three Regulatory Affairs Investigators, three Diversion Control Program Specialists, a Diversion Control Analyst, and many others. The presentation also described a Diversion Control Advisory Committee, comprising nine senior employees who met quarterly to provide "oversight, guidance and recommendations for improvement to the Diversion Control Program." Ex. 41 at 12.

During the meeting, a compliance employee provided an overview of the seven elements of an effective compliance program. Zimmerman explained how the Company's compliance program satisfied each element. Management also reported that the healthcare regulatory practice group at Reed Smith LLP had reached the same conclusion while also recommending improvements to make the program even more robust.

The plaintiffs point out that whatever the content of the presentation, the reality was that the Revised OMP was flagging an infinitesimal level of suspicious orders. The plaintiffs contend that directors operating in good faith, against a backdrop of the opioid crisis and in the context of heightened levels of regulatory scrutiny, could not have accepted

20

these figures as the legitimate outcomes of a functioning system. The plaintiffs maintain that the board should have questioned the microscopic levels of suspicious order reporting and sought to improve the system.

Instead, the board focused on how to change the public perception of the opioid crisis and AmerisourceBergen's role in it. The discussion explored how public relations efforts could improve the balance of media coverage and how lobbyists could reach key audiences.

AmerisourceBergen's order reporting statistics for 2017 as a whole resembled its numbers for 2015 and 2016. AmerisourceBergen received 24,319,706 opioid orders. The Company flagged 87,224 for examination, representing a rate of 0.359%. The Company determined that only 176 orders were actually suspicious, reflecting a rate of 0.0007% of total orders and 0.2% of flagged orders.

During 2017, a consortium of attorneys general from forty-one states requested documents and information from AmerisourceBergen and other opioid distributors as part of an investigation into their distribution practices. In December 2017, the Judicial Panel on Multidistrict Litigation consolidated what was then nearly two hundred pending opioid-related cases into a multidistrict litigation in the United States District Court of the Northern District of Ohio (the "Opioid MDL").

## G.    2018: More Red Flags

In January 2018, after AmerisourceBergen failed to respond to a November 2017 records request, the State of Delaware filed a complaint alleging that AmerisourceBergen "routinely and continuously violated [Delaware] laws and regulations," including

regulations requiring distributors to reject suspicious orders, conduct due diligence of customers, and maintain inventory security and control systems to prevent diversion. Compl. ¶ 250. In February, the Cherokee Nation filed a complaint against AmerisourceBergen for having fueled the opioid crisis in Oklahoma. By this point, AmerisourceBergen faced 840 cases in state and federal courts, as well as the investigations being conducted by the Department of Justice and by the United States Attorneys' Offices for New Jersey, New York, Colorado, and West Virginia.

During a meeting in April 2018, the Audit Committee reviewed an audit of the Revised OMP, which the minutes described as something that the Audit Committee was doing "for the first time." *Id.* ¶ 221. Management staunchly defended the Revised OMP. When testifying before the House Committee on May 8, 2018, the Company's CEO denied that AmerisourceBergen had contributed to the nation's opioid epidemic while maintaining that the Company's order management program was fully compliant with the law.

Two months later, in July 2018, Senator McCaskill published a report titled *Fueling an Epidemic, Report Three: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement*. The report concluded that AmerisourceBergen, McKesson, and Cardinal Health consistently failed to meet their reporting obligations regarding suspicious orders. The report observed that AmerisourceBergen was the most egregious of the three, and that the Company reported suspicious orders far less frequently than its competitors. Between 2012 and 2017, AmerisourceBergen shipped approximately 650 million dosage units to Missouri customers and reported only 224 orders as suspicious. McKesson reported seventy-five times more suspicious orders on similar order volumes.

Cardinal Health reported twenty-three times as many suspicious orders on half the order volume.

In December 2018, the House Committee released a report titled *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia.* The report found that AmerisourceBergen, McKesson, and Cardinal Health failed to address suspicious order monitoring in West Virginia. It concluded that beginning in 2013, AmerisourceBergen's reporting of suspicious orders declined significantly from a high of 792 orders in 2013 to a low of only three orders in 2016. The report inferred that the trend for West Virginia reflected a broader nationwide decline, because on a per-capita basis, West Virginia had the second-highest number of suspicious orders for all states. Stated differently, in all but one other state, AmerisourceBergen was reporting *fewer* suspicious orders on a per-capita basis.

Like the Senate report, the House report concluded that AmerisourceBergen's reporting failures were worse than its competitors. Between 2007 and 2017, McKesson reported more than 10,000 suspicious orders to the DEA for West Virginia customers. AmerisourceBergen only reported 2,000 suspicious orders during the same period.

The House report provided examples of how the Independent Pharmacy Strategy and its program of "light touch" regulatory oversight operated in practice. For example, in 2011, AmerisourceBergen approved Westside Pharmacy as a new customer despite the fact that two of the six prescribing "Pain Doctors" were located substantial distances away from the pharmacy. AmerisourceBergen did not conduct any investigation into why Westside Pharmacy was filling prescriptions for one doctor whose office was a four-hour round-trip

23

drive away or for a second doctor whose office was an eleven-and-a-half-hour round-trip drive away. AmerisourceBergen discontinued supplying Westside Pharmacy with opioids in 2012, then approved a new customer application for Westside Pharmacy in January 2016, without any reference to the pharmacy's prior history with the Company. AmerisourceBergen also did not consult public news reports that contained red flags about the top prescribing physicians.

In another example, the House report described how AmerisourceBergen responded inconsistently when pharmacies placed suspicious orders. AmerisourceBergen claimed that repeated suspicious orders for a single customer would be considered a problem, yet the Company continued to supply Beckley Pharmacy for nearly a year after reporting 109 suspicious orders filled by that pharmacy in five months from 2013 to 2014.

AmerisourceBergen's order reporting statistics for 2018 resembled its numbers for 2015, 2016, and 2017. AmerisourceBergen received 26,520,195 opioid orders. The Company flagged 75,431 for examination, representing a rate of 0.284%. The Company determined that only 489 orders were actually suspicious, reflecting a rate of 0.0018% of total orders and 0.6% of flagged orders.

## H.    2019: Still More Red Flags

In February 2019, the board received a report detailing over 1,600 federal cases that were pending in the Opioid MDL, numerous cases pending in state courts, an investigation being undertaken by a coalition of state attorneys general, and subpoenas from numerous United States Attorneys' offices. The Attorney General for the State of Florida filed suit in November 2018, and the Attorney General for the State of Georgia filed suit in January

24

2019. The directors also were informed that the United States Attorney's Office for the District of New Jersey had notified management that it was opening a criminal investigation.

In March 2019, the Attorney General for the State of Washington filed suit. The Attorney General for the State of New York filed its own action that same month.

In May 2019, the board received another legal update. By this point, the number of federal cases consolidated in the Opioid MDL had climbed to 1,800, and there were over 270 cases in state court. The Company also faced thirteen investigations and lawsuits from state attorneys general. The directors reviewed the status of discovery, the prospects for bellwether trials, and the status of settlement discussions.

In August 2019, the Audit Committee received a presentation on "diversion control and an Order Monitoring Program update." *Id.* ¶ 226. The accompanying eighteen-page presentation explained that the Company had a "[c]omprehensive program to prevent diversion" that had continued to "evolve and expand," including by "prohibiting sales of schedule II controlled substances to secondary customers" and using "[e]nhance[d] data analytics to monitor and predict trends." *Id.* ¶ 227.

On October 21, 2019, on the eve of trial for one of the bellwether cases in the Opioid MDL, AmerisourceBergen, McKesson, and Cardinal Health settled the case for a payment of $215 million.

AmerisourceBergen's order reporting statistics for 2019 resembled its numbers for 2015, 2016, 2017, and 2018, albeit with slight increases in the numbers of orders flagged and reported. AmerisourceBergen received 27,030,389 opioid orders. The Company

25

flagged 66,009 for examination, representing a rate of 0.244%. The Company determined that only 1,091 orders were actually suspicious, reflecting a rate of 0.004% of total orders and 1.65% of flagged orders.

## I.     2021: The Settlements

In the summer of 2021, AmerisourceBergen, McKesson, and Cardinal Health offered a global settlement worth $21 billion to resolve all claims by the states and localities in the Opioid MDL. On July 20, 2021, AmerisourceBergen, Cardinal Health, McKesson, and Johnson & Johnson agreed to settle a case brought by the Attorney General of New York for $1.18 billion. They simultaneously entered into the 2021 Settlement with various other states and localities. The total settlement consideration was $26 billion. AmerisourceBergen agreed to pay approximately $6.4 billion over eighteen years.

As part of the 2021 Settlement, AmerisourceBergen agreed to permanent injunctive relief that remedied deficiencies in the Revised OMP and required direct board oversight of the program. Among other things, AmerisourceBergen committed to improving its monitoring of customer red flags, conducting more thorough due diligence, and using model-based thresholds that would actually identify and stop suspicious orders. In addition, AmerisourceBergen agreed to establish the position of Chief Diversion Control Officer and form a management-level committee that would report regularly to the board on anti-diversion efforts. AmerisourceBergen also agreed to create a board-level Compliance Committee to directly oversee the new order management program.

In return for this package of relief, AmerisourceBergen and the individual defendants received expansive releases of claims. The plaintiffs view the corporate

26

governance measures as steps that the directors could and should have taken years before, but which they saved to use as settlement currency.

As of January 2021, anticipated opioid settlements had caused the Company to suffer an operating loss of $5.135 billion (approximately $16.65 per share). Despite the massive harm to AmerisourceBergen, the directors approved a raise of $14.3 million for the Company's CEO, reflecting an increase of 26%.

## J.      The West Virginia Decision

On July 4, 2022, the West Virginia Court issued its post-trial decision in litigation that the City of Huntington and the Cabell County Commission filed against the Big Three distributors. *City of Huntington v. AmerisourceBergen Drug Corp. (West Virginia Decision)*, — F. Supp. 3d —, 2022 WL 2399876 (S.D.W. Va. July 4, 2022). The cases had been part of the Opioid MDL, then were remanded back to the West Virginia Court as the bellwether cases for the lawsuits against distributors. *Id.* at *1. The trial ran from May 3, 2021, through July 12, 2021, during which seventy witnesses testified either live or by deposition. *Id.* at *1–2.

Huntington and Cabell asserted that the defendants' practices of wholesale distribution of opioids in Huntington and Cabell created a public nuisance. As their principal defense, the defendants argued that their activities complied with law and therefore could not constitute a nuisance.

The evidence showed that West Virginia had been ground zero for the national opioid epidemic and was the hardest-hit state in the country. The evidence showed that Huntington and Cabell were among the West Virginia communities most affected by the

27

opioid epidemic. *Id.* at *8. The question was whether any of the defendants contributed to the epidemic by failing to comply with their anti-diversion obligations and thus creating a public nuisance.

To evaluate the sufficiency of AmerisourceBergen's anti-diversion program, the West Virginia Court reviewed the program's development from its origins in 1996. *Id.* at *13–16. The court discussed the events of 2007 which resulted in the 2007 OMP. *Id.* at *14–16. The court also discussed events in 2014 and 2015 that led to the Revised OMP. *Id.* at *16. The West Virginia Court found that "[b]y 2008, each defendant had in place an SOM [Suspicious Order Monitoring] program that blocked all suspicious orders they identified." *Id.* at *61.

The West Virginia Court next reviewed the plaintiffs' evidence, finding that "Plaintiffs did not prove that defendants failed to maintain effective controls against diversion and design and operate sufficient SOM systems to do so. Relatedly, plaintiffs did not prove that defendants' due diligence with respect to suspicious orders was inadequate." *Id.* at *25.

The West Virginia Court analyzed the expert testimony on which the plaintiffs relied and found that evidence "unpersuasive." *Id.* The plaintiffs' expert reviewed data on AmerisourceBergen's shipments into Huntington and Cabell between 2002 and 2018. The expert offered six different analyses of the data, each of which was designed to demonstrate that AmerisourceBergen identified only a fraction of the suspicious orders that should have been flagged. *Id.* at *26–29. The West Virginia Court rejected each of the methods, finding

28

that they "were not convincing ways to achieve accurate results of the number of orders that should have been flagged or blocked." *Id.* at \*26.

The West Virginia Court found that the plaintiffs had failed to prove that the Big Three had acted unreasonably in supplying opioids in Huntington and Cabell. The court reviewed the evidence regarding the causes of the opioid crisis and found most persuasive the role of changing standards of care and the decisions that doctors made to prescribe opioids to help patients with pain. The court found that the defendants were not responsible for an oversupply of opioids. Instead, "[d]octors in Cabell/Huntington determined the volume of prescription opioids that pharmacies in the community ordered from defendants and then dispensed pursuant to those prescriptions." *Id.* at \*49.

The West Virginia Court found no evidence that any of the defendants distributed through pill mills. *Id.* at \*53. The court found "no evidence that Defendants ever distributed controlled substances to any entity that it knew was dispensing for any purpose other than to fill legitimate prescriptions written by doctors." *Id.* And the court found that the levels of prescription and distribution in Cabell County "matched almost perfectly," with an average of 141.2 opioid pills prescribed per person and an average of 142.19 opioid pills distributed per person. *Id.* at \*49.

Based on these findings, the West Virginia Court ruled that "[n]o culpable acts by defendants caused an oversupply of opioids in Cabell/Huntington." *Id.* \*61. The court explained that under the Controlled Substances Act, the distributors were charged with preventing opioids from being sent to rogue pharmacies. The distributors were not expected to address over-prescribing. *Id.* at \*64. And the distributors were not responsible for

29

policing any diversion that occurred downstream from their pharmacy customers. *Id.* at *65. The court found "no admissible evidence in this case that defendants caused diversion that resulted in an opioid epidemic." *Id.*

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1 for failure to plead demand futility. On a cold read, the relevant language in Rule 23.1 hardly suggests that it would play such an outsized role in corporate jurisprudence. In its entirety, Rule 23.1(a) states:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The innocuous language of the second sentence supports the edifice of Rule 23.1 motion practice.

Rule 23.1's second sentence is the "procedural embodiment" of substantive principles of Delaware law. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors,

30

rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).[4] "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. *See id.*

In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim. *Aronson*, 473 A.2d at 811. Unless the

---

[4] In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson* to the extent that they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814. The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits their cumbersome subsequent history.

More recently, the Delaware Supreme Court overruled *Aronson* and *Rales*, to the extent that they set out alternative tests for demand futility. *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). The high court adopted a single, unified test for demand futility. Although the *Zuckerberg* test displaced the prior tests, cases properly applying *Aronson* and *Rales* remain good law. *Id.* This decision therefore does not identify any precedents, including *Aronson* and *Rales*, as having been overruled by *Zuckerberg*.

board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation. *Zuckerberg*, 262 A.3d 1047; *Ainscow v. Sanitary Co. of Am.*, 180 A. 614, 615 (Del. Ch. 1935) (Wolcott, C.) (citing *Sohland v. Baker*, 141 A. 277 (Del. 1927)).

Rule 23.1 imposes a pleading requirement so that demand principles can be applied at the outset of a case to determine whether the plaintiff has standing to sue. *See Zuckerberg*, 262 A.3d 1047. To satisfy the pleading requirements of Rule 23.1, the plaintiff "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings . . . ." *Brehm*, 746 A.2d at 254. Under the heightened pleading requirements of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by allegations of specific fact may not be taken as true." *Grobow*, 539 A.2d at 187.

The requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations. "The well-pleaded factual allegations of the derivative complaint are accepted as true on such a motion." *Rales*, 634 A.2d at 931. "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *Brehm*, 746 A.2d at 255. Rule 23.1 requires that a plaintiff allege specific facts, but "he need not plead evidence." *Aronson*, 473 A.2d at 816; *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence.").

32

The plaintiffs in this case chose not to make a pre-suit demand. The operative question is therefore whether "demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006).

When conducting a demand futility analysis, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg*, 262 A.3d at 1059. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.*

The plaintiffs rely only on the second basis for establishing director interestedness. They contend that nine out of the ten directors in office when the plaintiffs filed their lawsuit have served on the board since 2015 or earlier, with some directors serving since as early as 2010. The plaintiffs claim that those directors face a substantial risk of liability on the claims that the plaintiffs have asserted, because they ignored the red flags giving rise to the Red-Flags Claim and made the business decisions giving rise to the *Massey*

33

Claim. When a plaintiff advances that type of argument, the demand analysis effectively folds into an analysis of the strength of the underlying claims.

## A. The Red-Flags Claim

The plaintiffs' first theory is their Red-Flags Claim. That theory derives from the Delaware Supreme Court's decision in *Graham v. Allis-Chalmers Manufacturing Co.*, 188 A.2d 125 (Del. 1963), "which had long been held out as embracing the protective 'red flags' rule" that premised director liability on a failure to take action despite being aware of red flags indicating wrongdoing. Martin Lipton & Theodore N. Mirvis, *Chancellor Allen and the Director*, 22 Del. J. Corp. L. 927, 939 (1997). Under the rule in *Allis-Chalmers*, directors had no duty to act "absent cause for suspicion." 188 A.2d at 130. Most significantly, the *Allis-Chalmers* court stated that directors had no duty "to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." *Id.* Under *Allis-Chalmers*, therefore, directors arguably had no duty to set up a reasonable oversight system to facilitate board-level oversight. They only needed to act when information came to their attention. *Id.*

In the landmark *Caremark* decision, Chancellor Allen artfully explained why the colorful language in *Allis-Chalmers* about a system of corporate espionage "could not be generalized into a rule that, absent grounds for suspected law violation, directors had no duty to assure that an information gathering and reporting system exists to provide senior management and the board with material internal operating information, including as regards legal compliance." Lipton & Mirvis, *supra*, at 939. *Caremark*'s contribution was

34

to explain that a board's fiduciary duties encompass the need to make a good-faith effort to ensure that

> information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.

*In re Caremark Int'l Inc. Deriv. Litig*, 698 A.2d 959, 970 (Del. Ch. 1996).

*Caremark*'s second major contribution was to explain when directors could be held liable for failing to implement a reporting system to facilitate board oversight. In the words of the original decision,

> only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability. Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to good faith performance of duty by such directors.

*Id.* at 971 (emphasis omitted).

In *Stone*, the Delaware Supreme Court adopted the reasoning of *Caremark* and identified two types of *Caremark* claims. The high court wrote that the plaintiff must allege particularized facts supporting a reasonable inference that either "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its

operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. This framing has led to the claims being called prong-one and prong-two *Caremark* claims. Technically, only a prong-one claim traces its lineage to *Caremark*. A prong-two claim traces its lineage to *Allis-Chalmers*.

In this case, the plaintiffs have not advanced a prong-one *Caremark* theory. They have advanced a Red-Flags Theory in which they assert that the defendants ignored red flags by failing to take action to fix the Revised OMP and improve AmerisourceBergen's system of board oversight until they could use those changes as part of the currency for the 2021 Settlement.

Relying on this court's decision in *Reiter v. Fairbank*, 2016 WL 6081823 (Del. Ch. Oct. 18, 2016), the defendants argue that subpoenas and investigations do not rise to the level of red flags. In *Reiter*, the plaintiff alleged that the board of a large bank ignored red flags showing that the bank's check-cashing business was failing to comply with anti-money laundering ("AML") regulations. The complaint alleged that the board knew about six grand jury subpoenas that had been served on the company, had received reports stating that the company's AML risk was high, and had been told that the company's AML compliance program had been rated as inadequate. *Id.* at *13. The court dismissed the complaint, holding that the plaintiff had not alleged "red flags of illegal conduct" but merely "yellow flags of caution" which suggested "escalating AML compliance risk that was occurring in tandem with heightened regulatory scrutiny." *Id.* The *Reiter* decision also found that the documentary record at the pleading stage showed that the directors engaged in sufficient oversight of management's efforts to negate any inference that they

36

consciously failed to respond to red flags, even if it was debatable whether they engaged in sufficient oversight. *Id.* at *1, *14.

Whether allegations about investigations, subpoenas, and lawsuits rise to the level of red flags "depends on the circumstances." *Fisher v. Sanborn*, 2021 WL 1197577, at *12 (Del. Ch. Mar. 30, 2021). "A settlement of litigation or a warning from a regulatory authority—irrespective of any admission or finding of liability—may demonstrate that a corporation's directors knew or should have known that the corporation was violating the law." *Rojas v. Ellison*, 2019 WL 3408812, at *11 (Del. Ch. July 29, 2019). In this case, the complaint identifies over seventy examples of subpoenas, settlements, civil litigation, congressional reports, and analyses of regulatory risks that put the directors on notice of problems at the Company. The directors did not just see red flags; they were wrapped in them.

The defendants also argue that the complaint does not support an inference that the directors consciously disregarded their obligation to address the red flags. The defendants advance arguments about actions that they took between 2007 and 2012. But for the plaintiffs' claim, the critical period started in 2015, after the Revised OMP went into effect. During that period, the defendants can point to only three instances of board involvement. The full board requested and received an in-depth review of the Company's compliance systems in 2017. The Audit Committee conducted its first-ever review of the Revised OMP in 2018, then conducted another review in 2019. The defendants say that the court cannot infer a conscious decision to ignore red flags when the directors received those reports.

37

Three instances are better than none, but they would not be enough to warrant dismissal when evaluated against the panoply of allegations in the complaint. That is particularly so when the content of the reports detailed the paltry number of suspicious orders that the Company was identifying, yet the defendants did nothing in response. The allegations of the complaint support a reasonable inference that the defendants knew that some level of corrective action was required, but they did not want to do anything that might imply that the Company's existing systems were inadequate. Instead, they wanted to save those measures to use as settlement currency when they could obtain a global release. Until they could achieve a settlement, they went through the motions. *See Massey Energy*, 2011 WL 2176479, at *19 (drawing inference that outside directors went "through the motions" rather than making "good faith efforts to ensure that [the company] cleaned up its act").

The allegations of the complaint fairly support two competing inferences. One reasonable inference is that the directors received reports on the Revised OMP and the Company's anti-diversion control systems, determined that the Company's existing systems were adequate, and made a legitimate business judgment to do nothing. Another reasonable inference is that the directors knew that the Company's existing systems were inadequate and consciously decided not to take any action in response to the red flags. This case is at the pleading stage. At this stage of the case, the plaintiffs get the benefit of the inference they seek.

If that were the state of the pleading-stage record, the Red-Flags Claim would survive. But there is another factor that tips the outcome in favor of the defendants. In the

*West Virginia Decision*, the West Virginia Court found on the merits after a lengthy trial that AmerisourceBergen had an adequate anti-diversion program in place. *West Virginia Decision*, 2022 WL 2399876, at *61. The West Virginia Court found no evidence that AmerisourceBergen distributed opioids to pill mills. *Id.* at *53. Based on its findings, the West Virginia Court ruled that "[n]o culpable act by defendants caused an oversupply of opioids in Cabell/Huntington." *Id.* at *61.

The findings in the *West Virginia Decision* are not preclusive, but they are persuasive. The Red-Flags Theory depends on an inference that the officers and directors knowingly caused the Company to fail to comply with its anti-diversion obligations. The West Virginia Court found that AmerisourceBergen did not fail to comply with its anti-diversion obligations. That finding knocks the stuffing out of the plaintiffs' claim.

The plaintiffs argue that the *West Virginia Decision* did not specifically address the Revised OMP, but that is incorrect. The *West Virginia Decision* did address the Revised OMP as part of the changes that the Company made in 2014 and 2015. *See* 2022 WL 2399876, at *16. The court's discussion did not continue after that point, but that is consistent with the plaintiffs' allegation that the defendants did not make any further changes in their order monitoring program until the 2021 Settlement. The West Virginia Court's analysis included the Revised OMP, and the West Virginia Court expressly found AmerisourceBergen's anti-diversion controls were legally compliant. *Id.* at *61.

A variant of this objection would be that the *West Virginia Decision* did not address the full period leading up to the 2021 Settlement. To reiterate, the *West Virginia Decision* addressed the Revised OMP, and that was the system in place until the 2021 Settlement.

39

The West Virginia Court also analyzed an expert opinion that covered AmerisourceBergen's sales in Huntington and Cabell County from 2002 through 2018. *Id.* at \*26. That period included the three years after the adoption of the Revised OMP. The plaintiffs have not provided any reason to think that anything changed after that point.

Another possible objection would be that the *West Virginia Decision* only addressed order diversion in Huntington and Cabell County, not elsewhere. But the West Virginia Court found that the opioid problem in West Virginia was the worst in the nation and that Huntington and Cabell County were among the worst localities in West Virginia. If there was anywhere that AmerisourceBergen could have been held liable for not complying with its order-diversion obligations, that was the place.

In light of the *West Virginia Decision*, it is not possible to infer that the Company failed to comply with its anti-diversion obligations. It is therefore not possible to infer that at least half of the directors who were in office when the complaint was filed face a substantial likelihood of liability for ignoring red flags.

## B.     The *Massey* Claim

The plaintiffs' second theory is their *Massey* Claim. They contend that between 2010 and 2015, management and the directors made a series of conscious decisions which they knew would result in the Company failing to comply with its anti-diversion obligations, thereby evidencing the defendants' pursuit of a business plan that prioritized profit over legal compliance. They claim that after 2015, management and the directors adhered to the same business strategy and did not stray from it until the 2021 Settlement.

As with the Red-Flags Claim, the *Massey* Claim does not present at least half of the directors with a substantial threat of liability.

A *Massey* Claim derives from the fundamental proposition that

> Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue "lawful business" by "lawful acts." As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.

*Massey*, 2011 WL 2176479, at *20 (footnoted omitted); *accord Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."). "Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct." *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) (cleaned up).

Although sometimes lumped in with *Caremark*, a *Massey* Claim is technically not a *Caremark* claim. *Cf. Hamrock*, 2022 WL 2387653, at *17 n.144 (questioning whether a *Massey* Claim is a *Caremark* claim). Both a prong-one *Caremark* claim and a prong-two *Allis-Chalmers* claim rest on the defendants' failure to take action. A *Massey* Claim turns on affirmative acts.

41

The plaintiffs contend that starting around 2010, management and the directors made a series of decisions which, when taken together, support an inference that the defendants were prioritizing profits over compliance. The process started with the Independent Pharmacy Strategy and its light-touch, easy-onboarding model. It continued with the Walgreens alliance, which management projected would more than double the volume of the Company's controlled-substances orders, but was not accompanied by a similar increase in order-diversion resources. The clearest manifestation of the strategy was the adoption of the Revised OMP, which used a double-trigger test to reduce the number of orders of interest that the Company flagged for investigation. The Company already was flagging low levels of orders, and with the adoption of the Revised OMP, the Company's rates of suspicious order reporting fell to microscopic levels.

As with the Red-Flags Claim, if this were the state of the record, then the court would permit the claim to proceed past the pleading stage. When viewed as a whole, the allegations support a reasonable inference that the managers and directors acted with the intent necessary for a *Massey* Claim. The allegations about the Independent Pharmacy Strategy are relatively weak and would not be sufficient standing alone. The allegations regarding the Walgreens alliance and the failure to increase oversight personnel are stronger, but those allegations would not be enough either, whether independently or in conjunction with the Independent Pharmacy Strategy. What gets the plaintiffs the inference they need is the Revised OMP and its seemingly apparent purpose of driving down the already low number of suspicious orders that AmerisourceBergen was reporting.

As with the Red-Flags Claim, the defendants seek to defeat the *Massey* Theory by arguing that the board received a report about the Company's order monitoring system in 2017, and the Audit Committee reviewed the Revised OMP in 2018 and 2019. Yet the directors took no action, despite the Company's minuscule levels of suspicious order reporting. For the directors to receive those reports and take no action while the Company was facing a barrage of litigation and investigations supports a pleading-stage inference that the Company's fiduciaries had embarked on a strategy of prioritizing profits over compliance and were sticking to it. That is not the only possible inference, but it is one to which the plaintiffs would be entitled.

But as with the Red-Flags Claim, the *West Virginia Decision* is the plaintiffs' undoing. A *Massey* Claim depends on a business plan that violates the law. The West Virginia Court held that the Company's business plan did not violate the law. Given the *West Virginia Decision*, it is not possible to infer that management and the board consciously embarked on a business plan that violated the law. It is therefore not possible to infer that the *Massey* Claim poses a substantial threat of liability to the defendants.

## III.    CONCLUSION

The allegations of the complaint fail to support a basis for demand excusal. The plaintiffs therefore lack standing to litigate their claims on behalf of the Company. The action is dismissed. Under Rule 15(aaa), the dismissal is with prejudice solely as to the plaintiffs.

43